## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**BARBARA P. RAMSEY,**

       **Plaintiff,**

**vs.**                             **Case No. 5:13cv401-CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

       **Defendant.**

_____/

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a Social Security case referred to the undersigned U.S. Magistrate Judge upon consent of the parties and reference by District Judge Richard Smoak.  Doc. 12. *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the entire record, the decision of the Commissioner is affirmed.

## I.  Procedural History

On or about May 5, 2010, Plaintiff, Barbara P. Ramsey, filed an application for supplemental security income (SSI) pursuant to Title XVI of the Social Security Act, alleging disability beginning the date of filing.  R. 24, 42, 157, 170.  (Citations to the record shall be by the symbol "R" followed by a page number that appears in the lower right corner.)  Plaintiff's application was denied initially on August 6, 2010, and upon reconsideration on September 18, 2010.  R. 24, 83, 92, 97, 100.  On November 12, 2010, Plaintiff requested a hearing.  R. 24, 106.

On December 22, 2011, Administrative Law Judge (ALJ) Charles Wm. Dorman held a hearing in Tallahassee, Florida.  R. 24, 38-82.  Plaintiff was represented by Forrest E. Jackson, an attorney.  R. 17-18, 20, 24, 38, 40, 103-05, 148-56.  Plaintiff and Robert N. Strader, an impartial vocational expert, testified.  R. 24, 44-82, 141 (Resume of vocational expert).  At the conclusion of the hearing, the ALJ stated that he would arrange for Plaintiff to attend a consultative physical examination (CE).  R. 80-81, 690. After the hearing, the ALJ advised that he secured additional evidence including a neurological CE dated February 1, 2012, from E. Jacob, M.D., R. 684-92, and an x-ray of the lumbar spine dated January 31, 2012, from James M. Strohmenger, M.D., R. 681. Plaintiff's counsel (Quinn E. Brock) was also advised that a supplemental hearing could be requested.  R. 240-41.  On April 23, 2012, Plaintiff's counsel advised ALJ Dorman of Dr. Jacob's physical examination results and requested the ALJ to find Plaintiff disabled. R. 244.  In his decision, the ALJ stated that he "fully considered [counsel's] response" and that his

> ruling to include these post-hearing materials is explained in detail within the rationale of this decision.  I note that the claimant has not requested an opportunity to question the author of her post-hearing consultative exam, nor has she requested a supplemental hearing.  Even if the claimant had requested an opportunity to question the consultative examiner, I find such questioning unnecessary to inquire fully into the matters at issue.

R. 24.

On May 29, 2012, the ALJ entered a decision denying Plaintiff's application for benefits, concluding that Plaintiff was not disabled since May 5, 2010, the date the application was filed, R. 170.  R. 32.  At the outset of the hearing, Plaintiff's counsel

agreed with the ALJ that the onset date would be the date of the filing of the application. R. 42.

Plaintiff requested the Appeals Council to review the ALJ's decision and counsel submitted a brief.  R. 4, 16, 246-49.  On October 23, 2013, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner.  R. 1-5; *see* 20 C.F.R. § 404.981.  On December 5, 2013, Plaintiff filed a Complaint in this Court seeking judicial review.  Doc. 1.  The parties filed memoranda of law, docs. 17 and 18, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant has not engaged in substantial gainful activity since May 5, 2010, the application date."  R. 26.

2. "The claimant has the following severe impairments: hypertension, obesity, hepatitis C, asthma, degenerative disc disease and spondylosis, radiculopathy, history of cardiac catheterization and dyspnea."  *Id.*

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 27.

4. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 C.F.R. § 416.967(b), except she can never climb ladders, ropes and scaffolds; she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; she can tolerate only occasional exposure to extreme heat, extreme cold, wetness, humidity, excessive vibration and lung irritants; and she can tolerate no exposure to moving machinery and unprotected heights."  *Id.*

5. "The claimant is capable of performing past relevant work as a childcare worker (Dictionary of Occupational Titles # 359.677-018, specific vocational preparation level 4, light exertional level).  This work did not require the

performance of work-related activities precluded by the claimant's [RFC]."
R. 32.

6. "The claimant has not been under a disability, as defined in the Social
Security Act, since May 5, 2010, the date the application was filed." *Id.*

## III.  Medical and Other Evidence

### A.  The ALJ's Findings

At step four, the ALJ assessed Plaintiff's RFC and ultimately determined that

Plaintiff was able to perform her past relevant work as a childcare worker.  R. 27-32.

Plaintiff does not argue that the ALJ overlooked material evidence when making his

RFC assessment.  Rather, Plaintiff argues that the ALJ erred when he did not give

proper weight to the entire opinion of Dr. Jacob and erred because the ALJ did not

perform an assessment of the effect of Plaintiff's obesity on her ability to work.  Doc. 17

at 6-15.  The ALJ's material RFC findings are set forth below.

> Born January 31, 1958, the claimant was approaching advanced age on the date
> her supplemental security income application was filed.  The claimant has
> obtained a general equivalency diploma and she is able to communicate in
> English.  The claimant has alleged disability due to hypertension, obesity,
> hepatitis C, asthma, degenerative disc disease, spondylosis, radiculopathy,
> cardiac catheterization, multinodulargoiter, headaches, gastroesophageal reflux
> disease, thyromegaly, hyperlipidemia and dyspnea (2E; 3E; 7E; 8E; 11E;
> testimony).

> The claimant testified that she experiences fatigue and shortness of breath,
> which requires that she rest frequently at least 1 to 2 days per week.  The
> claimant said that she usually lies down to rest for at least 30 minutes to 1 hour
> every day.  The claimant reported occasional chest pains that occur about 2 to 3
> days per month. The claimant also said that she gets dizzy when her blood
> pressure is elevated.  The claimant testified that she has some difficulty bending
> due to back pain.  Rather than bend over, the claimant said that she is able to
> kneel or squat down to the floor in order to pick up dropped items.

According to her testimony, the claimant has the ability to perform hygiene and self-care tasks independently, perform household chores, prepare meals, shop for groceries and operate a motor vehicle.

The claimant alleged no medication side effects in August 2010 (7E), although she reported urination frequency with Lasix in November 2010 (11E). The claimant's current medication list at exhibit 16E was considered. When questioned during the hearing, the claimant reported medication side effects of drowsiness, dry mouth and fatigue resulting from current hepatitis C injections.

During the hearing, the claimant said that although her treating physician returned her to light duty work in October 2010, she has not attempted to return to work since that time.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Since filing her supplemental security income application in 2010, the claimant has reported intermittent chest pain and shortness of breath (2F; 11F; 15F).

The claimant was hospitalized for two days in April 2010 for chest pain and elevated blood pressure. Cardiac enzyme tests were negative, and the claimant was treated with nitroglycerine, which decreased her blood pressure and significantly improved her chest pains. She was discharged following significant clinical improvement (14F).

X-rays from April 2010 showed clear, well-expanded lungs, with no vascular congestive changes, infiltrates or effusions appreciated (2F/55).

The claimant was admitted for treatment again in May 2010 due to chest pain with shortness of breath. Her cardiac enzyme testing was negative. The claimant was assessed with "mild" reactive airway disease/asthma and she was treated with nebulizer treatments during her hospitalization. The claimant was discharged in stable condition with a prescription for Ventolin for her asthma-related symptoms (14F).

A cardiac catheterization showed no obstructive coronary artery disease and normal left ventricular systolic function in May 2010 (3F; 4F).

The claimant reported dyspnea on exertion in June 2010, and the resulting examination showed normal breath sounds, no rales, rhonchi, wheezes, rubs or crackles (6F/11-12).

A CT scan conducted in July 2010 identified no evidence of pulmonary thromboembolic disease (5F/2; 6F; 9F).

The claimant was admitted for an overnight hospital stay for abdominal pain, chest pain and shortness of breath in August 2010 (10F; 15F).  A chest x-ray showed a slight increase in interstitial vascular markings with no evidence of effusions or consolidations.  An echocardiogram showed septal and posterior left ventricular hypertrophy, no evidence of cardiac enlargement, ejection fraction range of 50-55%, trace pulmonic and trace mitral regurgitation, mild aortic regurgitation and moderate tricuspid regurgitation.  Cardiac enzyme tests were negative, and a CT scan of the claimant's abdomen was negative.  The claimant's pain resolved with administration of the pain reliever Ultram, and she was discharged in "very stable" condition (10F).

The claimant has reported lower back pain that radiates to her buttocks and both legs, which began in early 2011 after she reportedly fell out of a chair in her home.  The claimant alleged some difficulty bending over due to back pain; however, she testified that she is able to kneel or squat down to the floor in order to pick dropped items.

Objectively, x-rays obtained in May 2011 showed mild degenerative changes throughout the claimant's lumbar spine; her disc heights were appropriate; no subluxation or listhesis was present; no obvious acute abnormalities were observed; and the claimant's hips and S1 joints were benign (20F).  An electro diagnostic study of the claimant's lower extremities from December 2011 showed S1 radiculopathy on the left (19F).  Three views of the claimant's lumbar spine taken in January 2012 showed minimal degenerative change with no acute abnormality (21F).

Providers from the Tallahassee Orthopedic Clinic evaluated the claimant's low back pain in May 2011, and she was referred for physical therapy services.  The claimant reported some improvement; however, it was noted in June 2011 that the claimant had not been compliant in attending some of her scheduled appointments (20F/27).  In July 2011, the claimant decided to continue with conservative treatment, but by September 2011, physical therapy was deemed unsuccessful and an MRI was ordered.  The resulting imagining studies performed in October 2011 showed evidence of multilevel degenerative spondylosis with no disc protrusion or definitive impingement.  No definitive diagnosis was offered to explain the claimant's continued back pain, and she was

referred to vocational rehabilitation for possible pain management control and further testing.  The claimant was released to return only on an as-needed basis by the Tallahassee Orthopedic clinic in October 2011 (20F) [*see* R. 642-43].

The claimant is currently treated for chronic Hepatitis C, and progress notes show that she was doing well with treatment in May 2011 (16F).  During the hearing, the claimant reported some drowsiness, dry mouth and fatigue resulting from her hepatitis C injections.

E. Jacob, M. D., consultatively examined the claimant in February 2012 at the request of the Social Security Administration.  Upon examination, the claimant was alert and oriented, and there was no evidence of anemia, cyanosis, jaundice, clubbing or generalized lymphadenopathy.  No abnormalities were observed in the claimant's thoracic or cervical spine.  The lumbar spine had normal curvature, no tenderness and no paravertebral muscle spasms.  Straight leg raise testing was negative bilaterally, and the sciatic notch and sciatic joint areas were non-tender.  The claimant's jugular venous pressure was not elevated, her heart sounds were normal, there was no gallop or murmur, was no evidence of cardiomegaly, and the claimant's peripheral sensations were normal. The claimant's lungs were clear, and the base of the lungs were also clear without adventitious sounds.  The claimant's higher intellectual functions, speech, memory and affect were normal.  The claimant's cranial nerve examination produced the following results: normal funduscopic examination; Nerves II showed early cataracts bilaterally; Nerves III, IV, VI showed full movements with no nystagmus; the pupils were equal and reactive to light; the corneal reflexes were normal; Nerves V, VII showed no sensory loss or muscle weakness; Nerve VIII hearing was normal for both bone and air conduction; Nerves IX, X gag was normal and uvula was midline; Nerve XI trapezius and sternocleidomastoid muscles were normal with no atrophy noted; Nerve XII tongue was midline and normal in appearance with no fasciculation noted.  The claimant's tone, power and coordination in the upper and lower extremities were normal; finger-to-nose and toe-to-heel tests were negative; toe walk, heel walk and tandem walk were performed; ankle jerks were absent; and plantar reflexes were down-going; the claimant reported reduced pinprick sensation in the S1 dermatome distribution on the right, she had lymphedema on the left foot, and Romberg's test was negative (22F).

As for the opinion evidence, pursuant to 20 CFR 416.927, and Social Security Rulings 96-6p, 96-2p, my finding above is supported by reports from treating and examining physicians, as documented in the medical evidence of record. I have considered these medical source reports, along with opinions from State agency consultants, in my evaluation of the claimant's functional limitations and weighed them accordingly.

Disability Determination Service medical consultant, Olga M. Garcia, M.D., determined the claimant [is] capable of work at the light exertional level with the following environmental limitations in September 2010: avoid concentrated exposure to fumes, odors, gases, dusts, and poor ventilation due to asthma-related symptoms (12F).  I have considered and assigned significant weight to this assessment, as it is consistent with the overall evidence of record in this case.  Dr. Garcia's status as a licensed physician was also considered in evaluating tins opinion.

An unsigned medical excuse letter dated August 16, 2010, was produced by the T.J. Roulhac Clinic, which medically excused the claimant from work beginning on April 19, 2010 (15F/13).  In October 2010, the claimant's treating physician, Val-Dee Harmon Sheffield, M.D., of the T.J. Roulhac Clinic, returned the claimant to light duty work (15F/97).  Dr. Sheffield's opinion in returning the claimant to light duty work is assigned significant weight based upon its consistency with the overall evidence of record in this case.  Dr. Sheffield's status as a licensed, treating physician was also considered in evaluating this opinion.

Based upon his February 2012 consultative examination findings, Dr. Jacob asserted that the claimant is able to lift up to 20 pounds frequently and up to 50 pounds occasionally, and carry up to 10 pounds frequently and up to 50 pounds occasionally due to back pain with radicular symptoms.  Dr. Jacob determined the claimant able to sit for 1 to 2 hours at once; stand for 30 minutes at once; walk for 20 minutes at once; sit for a total of 6 hours in an 8-hour workday; stand for a total of 2 hours in an 8-hour workday; and walk for a total of 1 hour in an 8-hour workday with breaks.  Dr. Jacob limited the claimant to only frequent operation of foot controls; however, I note that the claimant's past work as a childcare provider does not require the operation of foot controls.  Dr. Jacob limited the claimant's climbing, balancing, stooping, kneeling, crouching and crawling to only occasional.  Dr. Jacob[']s added environmental limitations of only occasional exposure to moving machinery and unprotected heights (22F).

I have considered and assigned significant weight to the portion of Dr. Jacob's assessment regarding the claimant's ability to lift, as the other evidence of record supports this finding; however, little weight is given to the portion his assessment concerning the claimant's ability to sit and stand because Dr. Jacob based this finding on the claimant's "deconditioning," and not too [sic] a medically determinable impairment. The overall evidence of record generally supports Dr. Jacob's limitations on climbing, balancing, stooping, kneeling, crouching and crawling; however, in considering the record as a whole, I have added additional environmental limitations to my above-stated residual functional capacity assessment.

> In sum, the above residual functional capacity assessment above is well supported by the weight of the evidence of record, as I have considered the objective medical evidence of record, the treatment required by the claimant, the claimant's testimony and subjective complaints, and my assessment of the claimant's credibility.

R. 28-32.

The ALJ then determined that Plaintiff is capable of performing past relevant work as a childcare worker.  R. 32.  The ALJ relied, in part, on the testimony of the vocational expert.  *Id.*; *see* R. 78-79.  The ALJ expressly rejected the limitations suggested by Plaintiff's counsel in another hypothetical question posed to the vocational expert. R. 32 ("I find that the medical evidence of record does not support the limitations posed by the representative in this hypothetical, and accordingly, I have given no weight to the vocational expert's responsive testimony to the hypothetical."); *see* R. 79-80.

## IV.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 416.920(a)(4)(i)-(v):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[2]

---

[1]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[2]  A residual functional capacity (RFC) is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. Id.  The

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## V.  Legal Analysis

responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c).

### A.  The ALJ Properly Considered and Gave Appropriate Weight to the Opinion of Dr. Jacob.

Plaintiff argues that the Commissioner's decision should be reversed because the ALJ failed to give great weight to a portion of Dr. Jacob's opinion regarding Plaintiff's ability to sit and stand.  Doc. 17 at 6-12.

Dr. Jacob is Board Certified in Neurology and Clinical Neurophysiology.  R. 335-36.  On December 2, 2011, Plaintiff first appeared before Dr. Jacob based on a referral by M. Gaston, P.A., for an electrodiagnostic evaluation.  R. 635.  Dr. Jacob noted:

> The patient presents with low back pain and radiation of symptoms to the left leg. The patient showed weakness of the dorsiflexion and eversion of the left foot and ankle.  The ankle reflexes are absent bilaterally in the patient reported reduced pinprick sensation in the S1 dermatome distribution on the left.  Please note that patient has chronic lymphedema of the left leg.  Tinel's sign is negative over the tarsal tunnel.
>
> The patient underwent NCV and EMG evaluation.

R. 636.  Dr. Jacob noted that the results of the NCV study of the lower extremities were

> technically suboptimal because of the lymphedema of the left leg.  The peroneal motor study showed a normal latency, drop in amplitude and a normal velocity. The tibial motor response could not be obtained because of the lymphedema. The sural sensory response could not be elicited on the left side.  The peroneal F. wave latency is normal on the left.  The H flex latency is normal on the left.

R. 636.  Dr. Jacob's impression was "suboptimal NCV study."  *Id*.  Dr. Jacob reported the results of the EMG of Plaintiff's lower extremities:

> The paravertebral muscles in the lower lumbar area showed increased insertional activity, fibrillation, potentials, positive sharp waves and excess polyphasics.  The S1 innervated muscles on the left side showed increased insertional activity, fibrillation potentials excess polyphasics with reduced recruitment.

R. 535.  Dr. Jacob's electrodiagnostic impression was: "S1 radiculopathy on the left."

*Id*.  There is no indication from these two pages of notes that Dr. Jacob treated Plaintiff.

R. 635-36.

The administrative hearing was held on December 22, 2011.  R. 24.  At the

conclusion of the hearing, the ALJ stated that he would arrange for Plaintiff to attend a

consultative physical examination.  R. 80-81, 690.  After the hearing, the ALJ advised

that he secured additional evidence including a neurological CE dated February 2,

2012, from Dr. Jacob, R. 684-92, and an x-ray of the lumbar spine dated January 31,

2012, from James M. Strohmenger, M.D., R. 681.[3]  Plaintiff's counsel (Quinn E. Brock)

was also advised that a supplemental hearing could be requested.  R. 240-41.

In the decision, the ALJ summarized the results of Dr. Jacob's consultative

examination.  R. 30.[4]  (Dr. Jacob's report does not indicate that treatment was provided.

---

[3]  Dr. Strohmenger reviewed x-rays of the Plaintiff's lumbar spine (with three
views).  R. 681.  His findings are that Plaintiff "is leaning to the left.  The lumbar
vertebral bodies are intact on the lateral view.  The alignment and disc spaces on the
lateral maintained normally.  There is some minimal anterior scurrying at L2 and L3."  *Id*.
His impressions are: minimal degenerative change and no acute abnormality.  *Id*.

[4]  Based solely on Plaintiff's impairments, Dr. Jacob opined, by check marks on
the form, that Plaintiff could perform activities like shopping; travel without a companion
for assistance; ambulate without using a wheelchair, walker, or 2 canes or 2 crutches;
walk a block at a reasonable pace on rough or uneven surfaces; use standard public
transportation; climb a few steps at a reasonable pace with the use of a single hand rail'
prepare a simple meal and feed herself; provide for her personal hygiene; and sort,
handle, or use paper and files.  R. 689.  Dr. Jacob also opined that Plaintiff did not
require a cane to ambulate, that a cane was not medically necessary, and that with a
cane, Plaintiff can use her free hand to carry small objects.  R. 685.  In his type-written
physical evaluation, Dr. Jacob's impressions were: history of chest pain and
palpitations; workup negative for coronary artery disease and heart disease; history of
hypertension; and history of low back pain with radicular symptoms.  R. 692.

*Id.*)  Dr. Jacob also provided a medical source statement of Plaintiff's ability to do work-

related activities (physical).  R. 684-89.  The ALJ summarized Dr. Jacob's evaluation

and concluded:

> I have considered and assigned significant weight to the portion of Dr. Jacob's
> assessment regarding the claimant's ability to lift, as the other evidence of record
> supports this finding; however, *little weight is given to the portion [of] his
> assessment concerning the claimant's ability to sit and stand because Dr. Jacob
> based this finding on the claimant's "deconditioning," and not too [sic] a medically
> determinable impairment.*  The overall evidence of record generally supports
> Dr. Jacob's limitations on climbing, balancing, stooping, kneeling, crouching and
> crawling; however, assuming the record as a whole, I have added additional
> environmental limitations to my above-stated residual functional capacity
> assessment.

R. 31 (emphasis added).  Plaintiff takes issue with the ALJ giving "little weight" to the

emphasized portion of Dr. Jacob's assessment.  Doc. 17 at 9.

On April 23, 2012, Plaintiff's counsel (Mr. Jackson) advised ALJ Dorman of

Dr. Jacob's physical examination results and requested the ALJ to find Plaintiff disabled

pursuant to Medical-Vocational Guideline 201.14.  R. 244.  In part, Mr. Jackson

concluded that "Dr. Jacob's opinion supports a finding that Ms. Ramsey is limited to

sedentary exertional level work due to the limitation to standing a total of 2 hours during

an eight hour workday with breaks and only occasional stooping."  *Id.*  In his decision,

the ALJ stated that he "fully considered [counsel's] response" and that his

> ruling to include these post-hearing materials is explained in detail within the
> rationale of this decision.  I note that the claimant has not requested an
> opportunity to question the author of her post-hearing consultative exam, nor has
> she requested a supplemental hearing.  Even if the claimant had requested an
> opportunity to question the consultative examiner, I find such questioning
> unnecessary to inquire fully into the matters at issue.

R. 24.

The burden is on the claimant to prove she is disabled.  <u>Bell v. Bowen</u>, 796 F.2d

1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); <u>Wilkinson v.</u>

<u>Bowen</u>, 847 F.2d 660, 663 (11th Cir. 1987).  A disability is defined as a physical or

mental impairment of such severity that the claimant is not only unable to do past

relevant work, "but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement).  Both the "impairment"

and the "inability" must be expected to last not less than 12 months.  <u>Barnhart v.</u>

<u>Walton</u>, 535 U.S. 212 (2002).

Acceptable medical sources provide evidence in order to establish whether a

claimant has a medically determinable impairment.  These medical sources include

licensed physicians (medical or osteopathic doctors), licensed or certified psychologists,

and others.  20 C.F.R. § 416.913(a).  In addition to evidence from the acceptable

medical sources, evidence from other sources may be considered to show the *severity*

of the claimant's impairment and how it affects their ability to work.  20 C.F.R.

§ 416.913(d)(1).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the

medical opinions of the record, resolving conflicts that might appear.  20 C.F.R.

§ 416.927.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 416.927(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.'  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)."  *Id.*

As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own

medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Plaintiff refers to Dr. Jacob as a treating physician.  *See, e.g.*, Doc. 17 at 6, 8-9. Plaintiff also refers to Dr. Jacob's December 2011 evaluation, R. 635, and February 2012 assessment, R. 690-91, as "treatment notes" that "support his opinions."  Doc. 17 at 10.  Here, Dr. Jacob had one evaluation and one assessment of Plaintiff and Dr. Jacob's provided a "medical opinion" as a "medical source."  20 C.F.R. § 416.927(a)(2).  ("Medical opinions are statements from physicians and psychologists . . . [that] reflect judgment about the nature and severity of [the claimant's] impairments." 20 C.F.R. § 416.927(a)(2).)  There is no substantial evidence that Dr. Jacob provided actual treatment to Plaintiff in that Dr. Jacob did not record that he provided any plan of treatment to Plaintiff, including prescribing any medication.

Assuming that Dr. Jacob is a treating physician, agency regulations are clear that the "longer a treating source has treated [the claimant] and the more times [the claimant] have been seen by the treating source, the more weight we will give to the source's medical opinion."  20 C.F.R. § 416.927(c)(2)(i).  "When the treating source has

seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." *Id*.  Dr. Jacob did not provide the ALJ with "a detailed longitudinal picture of [Plaintiff's] medical impairment(s)" such that it brought "a unique perspective to the medical evidence that cannot be obtained from reports of individualized examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2).  Dr. Jacob's rather brief relationship with Plaintiff was that of a consultant, rather than a true treating physician.

Nevertheless, the ALJ accepted significant portions of Dr. Jacob's opinions that included Plaintiff's abilities comporting at least with the definition of light work.  20 C.F.R. § 416.967(b).  The ALJ accepted Dr. Jacob's lifting assessment as consistent with the record and consistent with the RFC that he fashioned.  R. 31.  The ALJ also accepted Dr. Jacob's assessment of the postural maneuvers that Plaintiff could perform. R. 31, 687.

The ALJ deviated from Dr. Jacob's statement to the extent he suggested Plaintiff would experience certain limitations in sitting, standing, and walking--limitations that Dr. Jacob confirmed were caused not by Plaintiff's physical impairments, but by "deconditioning." R. 31, 685.  When he assessed the lifting restrictions that appeared in his statement, Dr. Jacob explicitly confirmed that those, which the ALJ accepted, were the result of Plaintiff's back pain and radicular symptoms.  R. 684.  By contrast, when he set forth various sitting, standing, and walking limitations, Dr. Jacob explained that those particular limitations were "due to deconditioning," but did not define what he meant by

the phrase "due to deconditioning."  R. 685.

The ALJ explained that "little weight is given to the portion [of] his assessment concerning the claimant's ability to sit and stand because Dr. Jacob based this finding on the claimant's 'deconditioning,' and not too [sic] a medically determinable impairment."  R. 31.  The ALJ appropriately explained that "deconditioning" is not a medically determinable physical impairment within the meaning of the Social Security Act.  R. 31; *see, e.g.*, Cooper v. Comm'r of Soc. Sec., 521 F. App'x 803, 806-7 (11th Cir. June 3, 2013) (unpublished); Pinkins v. Astrue, Civil Action No: 09-6920 Section: "D" (5), 2010 U.S. Dist. LEXIS 102119, at *27 (E.D. La. Sept. 8, 2010), *approved and adopted by*, 2010 U.S. Dist. LEXIS 102693 (E.D. La. Sept. 24, 2010); Sturgill v. Astrue, Case No. 1:08-CV-687, 2010 U.S. Dist. LEXIS 15933, at *11-12 (S.D. Ohio Feb. 23, 2010).[5]

The ALJ's decision is further supported by the opinion rendered by non-examining state agency physician consultant Dr. Garcia, who reviewed the record in

---

[5]  The term "deconditioning" has been defined by several courts.  *See, e.g.*, King v. Colvin, No. 12 C 9280, U.S. Dist. LEXIS 59463, at *12 n.7 (N.D. Ill. Apr. 29, 2014) ("'Deconditioning' means 'a state of prolonged underuse of muscles.'" (citation omitted)); Ramsey v. Colvin, Case No. 4:12-CV-1003-NAB, 2013 U.S. Dist. LEXIS 137291, at *13 n.3 (E.D. Mo. Sept. 25, 2013) ("Deconditioning means to cause or lose fitness or muscle tone, especially through lack of exercise." (citation omitted)); Furtado v. Astrue, C.A. No. 07-387ML, 2008 U.S. Dist. LEXIS 56499, at *31 n.3 (D. R.I. July 25, 2008) ("Although the ALJ does not define the term 'deconditioning,' the Court assumes that she means that Plaintiff's lack of activity resulted in him becoming 'out of shape'").  "Deconditioning" has also been defined as "a change in cardiovascular function after prolonged periods of weightlessness, probably related to a shift of a quantity of blood from the lower limbs to the thorax, resulting in reflex diuresis and a reduction of blood volume."  Dorland's Illustrated Medical Dictionary 475 (32nd ed. 2012); *see* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 4.00D.3.d. (referencing deconditioning regarding evaluating chronic heart failure).

September 2010, and opined that Plaintiff's physical limitations were compatible with a range of light work.  R. 31, 461-66.[6]  The ALJ's decision is otherwise supported by the medical evidence, including but not limited to the patient records of Dr. Sheffield, one of Plaintiff's treating physicians, who, on October 18, 2010, stated that Plaintiff "may return back to work light duty," R. 603, as noted by the ALJ.  R. 31.  (In August 2010, Plaintiff had an unsigned medical excuse letter from the T. J. Roulhac Clinic that she was medically excused from work beginning on April 19, 2010, until further notice.  R. 31, 519.)  The ALJ assigned "significant weight" to Dr. Sheffield's opinion "based upon its consistency with the overall evidence of record in this case.  Dr. Sheffield's status as a licensed, treating physician was also considered in evaluating this opinion."  R. 31.

The ALJ's RFC assessment is consistent with the medical evidence.  Substantial evidence supports the ALJ's consideration and weight that was given to Dr. Jacob's opinions.  No error has been shown.

### B.  Substantial Evidence Supports the ALJ's Consideration of Plaintiff's Obesity

Plaintiff argues that the ALJ erred because he did not perform an assessment of the effect of Plaintiff's severe impairment of obesity on her ability to work.  Doc. 17 at 13-15.  In support, Plaintiff notes in part that she has other severe impairments including hypertension, hepatitis C, asthma, degenerative disc disease and spondylosis,

---

[6]  State agency medical consultants are "highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act."  *See* Social Security Ruling 96-6p.  Their opinions regarding an individual's RFC are entitled to consideration and weight.  20 C.F.R. § 416.927(e)(2).

radiculopathy, history of catheterization and dyspnea, identified by the ALJ, R. 26.  Doc.
17 at 14.  Plaintiff suggests that "it is reasonable to believe that [Plaintiff's] obesity would
exacerbate" these severe impairments "and cause more significant limitations in her
functional abilities."  *Id.*

As noted, the ALJ found Plaintiff's obesity to be a severe impairment and
addressed the issue at step two:

> At each step of the sequential evaluation process, I have specifically considered
> the effects of the claimant's obesity Social Security Ruling [SSR] 02-1p in
> formulating the claimant's residual functional capacity.  The claimant's medical
> records document "morbid obesity" in May 2011 (20F/41).  At hearing in
> December 2011, the claimant testified to a height of 5' 5" and a weight of 260
> pounds, which corresponds to a Body Mass Index (BMI) of 43.3, classified at
> Level III under the clinical guidelines specified in [SSR] 02-01p.  Because the
> claimant's obesity has more than a minimal impact on her ability to perform basic
> work activities, it is severe.

R. 27.

Plaintiff criticizes the ALJ for allegedly failing to consider her obesity in later steps
in the sequential disability analysis.  The ALJ referred to Plaintiff's claims of disability
due to obesity among other impairments.  R. 28.  The ALJ expressly referred to SSR
02-01p and noted that he had "specifically considered the effects of the claimant's
obesity" in "formulating the claimant's [RFC]."  *Id.*  In fashioning the Plaintiff's RFC, the
ALJ relied on the opinion of state agency physician Dr. Garcia who made a careful note
of Plaintiff's height, weight, and BMI in assessing limitations from Plaintiff's impairments-
limitations with which the ALJ generally concurred.  R. 31, 461-62.  The ALJ also relied
on the statement from Dr. Sheffield, who was acquainted with Plaintiff's severe obesity,
R. 445, 521, 525, 527, 529, that Plaintiff was approved for light duty in October 2010.

R. 31, 603.

Substantial evidence supports the ALJs consideration of Plaintiff's obesity when he determined her RFC.  *See generally* Solomon v. Comm'r of Soc. Sec., 532 F. App'x 837, 840-41 (11th Cir. 2013) (unpublished).  No error has been shown.

## VI.  Conclusion

Plaintiff has the burden to prove she is disabled.  Moore, 405 F.3d at 1211.  The record does not support Plaintiff's assertion that she was disabled since the date her application was filed, that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A).  Considering the record as a whole, the findings of the ALJ are based upon substantial evidence and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on June 25, 2014.

s/  Charles A. Stampelos_____
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**